Filed 3/16/21  P. v. Ward CA3
(unmodified opinion attached)

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>   v.<br><br>JOSEPH VINCENT WARD,<br><br>       Defendant and Appellant. | C088158<br><br>(Super. Ct. No. F17000213)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on February 24, 2021, be modified as follows:

On page 2, the first full paragraph, second sentence, beginning "That evening," is deleted and the following sentence is inserted in its place:

That evening, one of the guests and the victim's neighbor searched the property and found the victim's body under a tarp in a cabin.

1

There is no change in the judgment. The petition for rehearing is denied.

BY THE COUT:

/s/

Hull, Acting P. J.

/s/

Robie, J.

/s/

Renner, J.

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Nevada)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>JOSEPH VINCENT WARD,<br><br>    Defendant and Appellant. | C088158<br><br>(Super. Ct. No. F17000213) |

A jury found defendant Joseph Vincent Ward competent to stand trial and he was later convicted of murder.  On appeal, defendant challenges the sufficiency of the evidence supporting the jury's competency finding.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Few of the facts of defendant's underlying offense are relevant to the issue defendant asserts on appeal.  In short, the victim and defendant were close, and the victim referred to defendant as his son, although they were not biologically related.  Defendant

1

stayed on the victim's property for several days with his girlfriend and his girlfriend's daughter; the girlfriend and her daughter left a day or two later. A number of other guests were also staying at the victim's property at the time. Around the time of defendant's arrival, the victim noticed that several lottery tickets he kept in the garage had gone missing.

The victim went missing one morning and defendant left the property soon after. That evening, one of the guests and the victim's neighbor searched the property and found the victim's body under a tarp in the garage. Defendant was later apprehended with a small bloodstain on one of his boots that matched the victim's DNA profile. A detective interviewed defendant's girlfriend, who said defendant had told her he killed the victim.

The prosecution charged defendant with murder and defense counsel declared a doubt as to defendant's competency to stand trial. The court proceeded to conduct a jury trial on the issue of competence.

## I

### *Defense Evidence*

Detectives Andrew Liller and Rhiannon King conducted two interviews with defendant at defendant's request.[1] In the interviews, defendant explained he smoked methamphetamine with the victim when he arrived at the victim's property. Later, while he was doing yard work, he found a bone in the victim's garden. He felt that something underneath the ground was pushing up against him and he felt scared. He theorized the victim had a "device to make people disappear" that emitted steam. He believed the victim's girlfriend was buried underground.

---

[1] Recordings of the interviews were admitted into evidence and played for the jury at trial.

Defendant explained the victim worked for the government and had planted a "chip" in defendant.[2] He knew the victim had been dealing drugs and was in a secret society called the "book of names." He told the detectives he believed the victim was a serial killer and urged them to investigate further. He also mentioned the victim had kept two girls chained up in his lake house.

When the detectives asked defendant about his activities after the victim's murder, he declined to answer, saying "I don't wanna admit to doin' somethin'--." He said he "didn't murder anybody . . . if you look up the definition of murder" and repeatedly reminded the detectives his life was "on the line." He promised to speak with the detectives again if they went out to the property because he wanted to know if his thoughts were real. The first interview ended when defendant started crying.

In the second interview, defendant said he had talked to his lawyer and she was upset he had agreed to talk to the detectives. She had told him the detectives had sent cadaver-sniffing dogs out to the victim's property but had not found anything. Defendant explained that when he was on the victim's property, he felt something pushing up from beneath his feet and thought somebody was trapped underground. He thought the area under the garage was hollow.

Defendant expressed concern about going to prison, saying he could "get a life sentence" and "I can't see myself goin' to prison for this. I, I will kill myself in this jail." He urged the detectives to further investigate his claims, saying "I can't confess to you that I did this. Because right now, it just looks like that would make--it sounds like I'm makin' all this up and I'm a murderer. Find the evidence and then I . . . . [¶] Go find the bodies."

---

[2] Later investigation determined the victim had, in fact, been a confidential informant in a drug investigation in 2009.

Detective Liller attributed defendant's bizarre statements to drug use and observed defendant seemed to understand and respond appropriately to questions. In particular, the detective noted defendant carefully avoided talking about the details of the murder.

Correctional officers testified defendant had sometimes refused legal mail and visits from his attorney while in jail. On cross-examination, one officer acknowledged she had not observed any behavior from defendant she believed would qualify him as mentally ill, though she did not have any training in psychology.

Several phone calls defendant made to family members from jail were entered into evidence. In the first phone call, with his mother, defendant relayed a conversation he had had with his attorney involving the incriminating statement his girlfriend had made to investigators. He told his lawyer about the chip in his body and the victim's relationship to the government, but his lawyer had laughed at him. He drew a map for her to show where he had been on the victim's property. His attorney told him she wanted to delay the arraignment and waive the preliminary hearing. His mother urged him not to listen to his attorney.

In the next call, between defendant, his mother, and his sister, defendant complained his lawyer wanted to defer his plea because she wanted more time to investigate. He wanted to alert the media to his case, but his lawyer told him that was a bad idea. He also suspected his lawyer was attempting to lay the groundwork for an insanity plea because she asked him about whether he had ever had any head injuries. He was upset because "[t]hey're gonna make it look like I'm fuckin' crazy. They're gonna give me a life sentence."

Defendant told his mother he needed someone to go to the property and dig around to find bodies. He reiterated he did not trust his lawyer and wanted to fire her.

Defense counsel called Dr. Jason Roof, a forensic psychiatrist who was retained by the court to evaluate defendant. Dr. Roof reviewed witness statements associated with defendant's crime, jail telephone calls from defendant to his family members, and video

4

of the detective interviews of defendant. Dr. Roof did not interview defendant or review any medical records and did not provide a diagnosis of defendant's mental health condition.

Rather, Dr. Roof explained defendant displayed a "delusional belief system" that could be explained by a diagnosis of schizophrenia or delusional disorder. He noted defendant's belief that the victim's property contained "bodies underneath the ground . . . perhaps dead but also alive and tethered underground" and defendant's belief in a government cover-up. He did not find any evidence to suggest defendant was malingering. Defendant interrupted Dr. Roof's testimony several times, saying it was "[b]ullshit" and a "cover up for the DEA." Defendant eventually asked for a *Marsden*[3] motion and asked to leave the courtroom. The court denied the motion, but allowed defendant to leave the courtroom.

Dr. Roof opined defendant was not able to assist counsel in a rational manner because of his "persistent distrust" of defense counsel and insistent focus on trying to get others to dig up the victim's property to look for dead bodies. He also concluded defendant's symptoms affected his ability to understand the nature of the charges because defendant viewed the delusions as more concerning than the charges or the case against him.

On cross-examination, Dr. Roof noted defendant had been using methamphetamine at the time of the crime and that the drug use, rather than a mental health condition, could have contributed to defendant's statements. He also admitted offering an opinion on an individual he had not examined was "a departure from established methods of examination" offered by the American Psychiatry Association.

---

**3** *People v. Marsden* (1970) 2 Cal.3d 118.

Peter Kmeto, a criminal defense attorney, testified as an expert in the representation of criminal defendants. He explained visiting clients in jail helps establish a relationship with a client and is also a valuable way to gather information on the case. A defendant's refusal to meet with his or her attorney limits the defendant's ability to assist counsel and participate in a defense. A defendant's delusional beliefs could undermine his ability to assist counsel by causing him to focus exclusively on the delusion to the detriment of the defense. He explained defendant had failed to assist counsel and participate in his own defense by speaking to the detectives, refusing visits from his attorney, and accusing his attorney of lying to him.

On cross-examination, he acknowledged even mentally healthy defendants do not always make good legal decisions. Moreover, a defendant making statements like "my life's on the line" demonstrates an appropriate grasp of the gravity of his situation in a criminal case.

II

*Prosecution Evidence*

The prosecution called Dr. Kevin Dugan, a forensic psychologist, as an expert in trial competency in criminal law. Dr. Dugan was appointed to evaluate defendant, but defendant refused to meet with him. As a result, Dr. Dugan was not able to offer an opinion on the case. An interview, Dr. Dugan explained, is a "[c]ritical" step when evaluating a defendant's competence to stand trial. Dr. Dugan highlighted various assessments that could be performed in person to evaluate competency. Without a personal evaluation, it would be inappropriate to offer opinions about a defendant. In Dr. Dugan's opinion, a careful review of a defendant's medical history is also important.

Reviewing a police report is not an adequate substitute for personally evaluating a defendant because it shows only how a defendant was functioning at the time the report was created, not at the time of the competency evaluation. Law enforcement officer

6

interviews with a defendant are similarly limited. Even reviewing jail phone calls in addition to police reports and interviews allows no more than "an educated guess" about a defendant's condition.

Collin Nelson, an investigator with the district attorney's office, testified he followed up on defendant's claim the victim had kidnapped two young women and kept them in his lake house. Nelson interviewed defendant's former girlfriend, who confirmed defendant's account, but he could not find any missing person reports corroborating the story and did not investigate further.

Correctional Officer Paul Jacobson testified he had regular contact with defendant while he was in jail. He did not observe any bizarre behavior that gave him concerns about defendant's mental health. Moreover, he had asked defendant about his mental health history for jail classification purposes and none of defendant's responses raised any concerns about his mental health.

The prosecution introduced a series of jail phone calls defendant had made to family members. In one call, defendant discussed his girlfriend's statement to police that he had admitted killing the victim to her. He said he was not guilty of murder because murder is the "unlawful killing" of another. He also expressed his concern about serving a prison term, saying: "I'd rather fuckin' say I planned on doin' it and get a needle or somethin', get put to sleep. I don't wanna spend the rest of my life in a fuckin' cell. I'm in a cell all the time, mom."

In another call, defendant talked with his family about a conversation they had with defense counsel. They argued with defense counsel about waiving time for trial and defendant questioned whether the time for his trial began running from the date of his plea. Defendant recounted his interview with the detectives and said he suspected they were trying to get him to confess to the murder.

In a third call, defendant told his mother about a conversation he had with defense counsel. Defendant said he was tired of going back and forth to court, and defense

counsel explained she had just declared a doubt as to his competence. He asked defense counsel about evidence the prosecution had against him, and the two discussed the possibility of claiming he had acted in self-defense. He also asked defense counsel what a possible prison sentence for manslaughter would look like.

In a separate call, defendant asked his mother to speak to his girlfriend because he suspected the "cops threatened her" to provide incriminating information. He told her she needed to speak to his girlfriend and tell her to "put in writing that they threatened you or you made that up" because otherwise defendant would "go to prison for the rest of [his] life."

In another call, defendant complained his trial should have happened already. He discussed a similar case he had seen in the news involving a defendant who murdered a man he thought was the anti-Christ. The defendant in the other case also thought he had been "chipped by the government." The defendant tried to argue "he was crazy," and defendant thought defense counsel was trying to use a similar argument in his case. Defendant also relayed a conversation he had with defense counsel about seeking a new judge for the case. Defendant did not want a new judge because he "didn't have a . . . [¶] problem with the judge."

In a later call, defendant said he had been observing "other people's trials that are in the same kind of category," and decided he would not be "trying [to] say I'm cuckoo or something." Defendant stated he had tried to use the detective interview to explain how the victim had scared him many times in the past, and it did not make sense that he would kill the victim only now. Defense counsel told him he "shot [himself] in the foot by talking to the cops."

In one call, defendant reported he had received discovery showing the prosecution had evidence of the victim's blood on his boots. He discussed a variety of ways the blood could have gotten on the boots. He claimed the victim's family was "paying people off to do this."

8

Throughout the calls, defendant expressed general dissatisfaction with defense counsel. Among other things, he suspected she was working against him and playing "stupid games" by asking him to submit to a psychological evaluation. He joked about being incompetent and said he would not go to court or talk to his lawyer because they were just "circus clowns" and he did not want to "play their games." He accused defense counsel of being in on the "corruption" and "collusion" that was going on in the case and was upset when defense counsel told him they were probably going to "lose at this trial."

The prosecution called defendant's ex-wife, who testified she did not believe defendant had a history of mental health problems, although she had not spoken to him after he had been arrested.

The jury found defendant was mentally competent to stand trial. A separate jury later found defendant guilty of murder.

### DISCUSSION

Defendant argues the jury's competence finding is not supported by substantial evidence. Specifically, defendant asserts "he was so wrapped up in" his delusional beliefs that "he was not able to assist his lawyer in developing a defense based on the law and the real evidence in the case." Defendant proceeds to catalog the evidence supporting a finding he lacked competency to stand trial. We do not agree the jury had insufficient evidence to find defendant competent.

"The United States Supreme Court has 'repeatedly and consistently recognized that "the criminal trial of an incompetent defendant violates due process." ' [Citation.] A defendant is deemed incompetent to stand trial if he lacks ' " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [or] a rational as well as factual understanding of the proceedings against him.' " ' " (*People v. Lightsey* (2012) 54 Cal.4th 668, 690.)

"The applicable state statutes essentially parallel the state and federal constitutional directives." (*People v. Lightsey*, *supra*, 54 Cal.4th at p. 691.) Penal Code[4] section 1367, subdivision (a) provides: "A person shall not be tried or adjudged to punishment . . . while that person is mentally incompetent. A defendant is mentally incompetent for purposes of this chapter if, as a result of a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." There is a presumption of competence to stand trial, and the defendant bears the burden of proving by a preponderance of the evidence that he or she lacks competence. (§ 1369, subd. (f); see *Medina v. California* (1992) 505 U.S. 437, 446 [120 L.Ed.2d 353, 363-364] [this burden of proof does not offend federal constitutional principles]; *People v. Mendoza* (2016) 62 Cal.4th 856, 871.)

"We apply a deferential substantial evidence standard of review on appeal. 'In reviewing a jury's determination that a defendant is competent to proceed to trial, we give due deference to the trier of fact, and therefore view the record in the light most favorable to the verdict.' [Citations.] When the sufficiency of the evidence to support the verdict is challenged, our review is limited to the evidence presented at the competency trial." (*People v. Mendoza*, *supra*, 62 Cal.4th at pp. 871-872.)

Here, defendant understood the nature and potential consequences of the criminal proceedings against him. Both in the interview with Detectives Liller and King and in his phone calls, defendant frequently stated that his "life is on the line" and worried he might serve a life sentence if convicted. Peter Kmeto, the defense expert, agreed on cross-examination that such statements were indicative of a defendant who "very much understood the gravity or the seriousness of the charges [he] w[as] facing." And on more

---

**4**      Undesignated statutory references are to the Penal Code.

10

than one occasion, defendant attempted to parse the legal definition of murder to explain he had never engaged in any "unlawful" killings, demonstrating he understood the charges in his case.

Defendant expressed a basic understanding of criminal procedure as well, discussing, at various points, the rules involved in waiving time for trial, waiving a preliminary hearing, and the timeline involved for both. Defendant understood defense counsel had declared a doubt as to his competence to stand trial and understood the court would be sending experts to examine him to evaluate his competence. He understood the evaluation process and its place in the context of the criminal proceedings well enough to compare his case to a different criminal case he read about in the newspaper, which involved a defendant with similar delusions. Defendant also had the insight to recognize defense counsel was pursuing a similar competency argument in his case. Similarly, defendant said he had been "watching other people's trials" as they proceeded through competency evaluations and did not want to meet with any doctors because he had seen the results in those cases.

Defendant also had the ability to assist counsel in his defense. Defendant did not always agree to meet with his attorney, but he did have several substantive conversations with defense counsel about legal strategy and was able to recount those conversations in detail. In one of the first phone calls introduced into evidence, for example, he recounted a meeting with his attorney in which they discussed evidence that had been produced in discovery and the possibility of waiving time and/or a preliminary hearing. Defendant explained he met with defense counsel "for four hours . . . and it seemed like . . . 45 minutes." In subsequent calls, he would frequently describe meeting with his attorney to discuss similar strategic matters, including the timing of entering a plea, whether they should involve the media in his case, whether to pursue a self-defense theory in the case, and whether to seek judicial recusal. He asked defense counsel about potential sentences and was chided by defense counsel when he spoke with investigators. Even when

11

defendant was talking about trying to hire a new attorney, he was still meeting with and speaking to defense counsel.

Moreover, defendant frequently discussed the state of evidence in his case and understood the impact of that evidence. For example, defendant's girlfriend told investigators defendant had confessed to her. In a later call, defendant sought information about the girlfriend, who was a person of interest to investigators because investigators believed she or defendant had stolen lottery tickets from the victim shortly before his death. Defendant then tried to get his mother to speak to the girlfriend to get her to retract a statement she had made to investigators. He realized such a retraction could cause her legal trouble, but said "if you get charged a misdemeanor for it big whoop-di-fucking-do. If you get a probation for it, big whoop-di-do." Likewise, when he received evidence that the victim's blood had been found on one of his boots, he began hypothesizing how to explain the blood.

When defendant spoke with the detectives, he similarly recognized the impact a confession would have, telling them "I can't confess to you that I did this. Because right now, it just looks like that would make--it sounds like I'm makin' all this up and I'm a murderer." In later calls, he voiced concern about his statements to the detectives, saying he thought they were only trying to get him to confess. He later explained his intent in the interview was to demonstrate he had known the victim for 20 years and had not killed him, even though the victim had scared him many times, so it would not make sense to kill him now "when he's an old man." All of these statements indicate defendant had an ample understanding of the facts and evidence in his case and could express that understanding to others if he chose to do so.

Defendant claims his persistent obsession with his delusions undermined his defense such that it prevented him from working with defense counsel and damaged the attorney-client relationship. The conflict between defendant and defense counsel about defendant's delusions, however, arose in one of defendant's first meetings with his

12

attorney, when defense counsel did not believe his theory that the victim had implanted a microchip in his body. Despite this disagreement, he continued to meet with his attorney and received advice from her on several different strategic issues, as explained above. Even shortly before the competency trial, defendant met with his attorney for over two hours. And although defendant ignored his attorney's advice not to speak with investigators, the impact of that decision in the competency trial was diminished by the defense expert's admission that even mentally healthy defendants can make poor legal decisions. While defendant stated he distrusted his attorney and sometimes made decisions that ignored defense counsel's advice, "an uncooperative attitude is not, in and of itself, substantial evidence of incompetence." (*People v. Mai* (2013) 57 Cal.4th 986, 1034.) We conclude the jury's finding defendant was competent to stand trial is supported by substantial evidence.

DISPOSITION

The judgment is affirmed.

/s/_____
Robie, J.

We concur:

/s/_____
Hull, Acting P. J.

/s/_____
Renner, J.

13